**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
| | |
|---|---|
| In re: | :    Chapter 11 |
| | : |
| SJC, Inc. | :    Case No. 14-11763 (___) |
| | : |
| Debtor.[1] | :    **HEARING DATE: TBD** |
| | :    **OBJECTIONS Due At the Hearing** |
| | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DEBTOR'S MOTION FOR ORDER PURSUANT TO 11 U.S.C. §§ 105, 363, 364,
365 AND 554 (I) APPROVING ASSUMPTION OF AGENCY AGREEMENT (II)
APPROVING STORE CLOSING SALES, (III) AUTHORIZING THE DEBTOR TO
ABANDON PROPERTY, AND (IV) GRANTING RELATED RELIEF**

SJC, Inc., the above-captioned debtor and debtor-in-possession (the "Debtor") by and through its undersigned proposed counsel, requests the entry of an order (the "Approval Order"), substantially in the form filed herewith and attached hereto as **Exhibit 1**, pursuant to section 105(a), 363, 364, 365 and 554 of title 11 of the United States Code (the "Bankruptcy Code"), (i) authorizing the assumption of that certain Agency Agreement (the "Agency Agreement"), attached to the Approval Order as **Exhibit A**, dated as of July 19, 2014, between the Debtor, on the one hand, and Hilco Merchant Resources, LLC ("Hilco" or the "Agent") on the other hand; (ii) authorizing the Debtor, through Agent, to conduct going-out-of-business, store closing sales (the "Store Closing Sales") at the retail store locations identified on Exhibit 1 to the Agency Agreement (collectively, the "Closing Stores") in accordance with the terms of the Store Closing Sale Guidelines (the "Sale Guidelines"), which are attached as Exhibit 8.1 to the Agency Agreement and as **Exhibit B** to the Approval Order, with such sales to be free and clear of all liens, claims, interests and encumbrances; (iii) authorizing the Debtor

---

[1] The last four digits of the Debtor's taxpayer identification number are 8350.  The Debtor's corporate headquarters are located at Burbank, California.

to abandon property, and (iv) granting such other requested relief as may be appropriate. In further support of this Motion, the Debtor states as follows:

## Jurisdiction and Venue

1.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b) and the Court may enter a final order consistent with Article III of the United States Constitution.  Venue in this district is proper under 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief requested in the Motion are sections 105,363,364,365 and 554 of the Bankruptcy Code.

3.      Pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, the Debtor consents to the entry of a final order or judgment by the Court with respect to the Application if it is determined that this Court, absent consent of the parties, cannot enter a final order or judgment consistent with Articile III of the United States Constitution.

## Background

4.      On July 21, 2014 (the "Petition Date"), the Debtor commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtor is authorized to operate its business and manage its properties as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this chapter 11 case (the "Case").

5.      Western Glove Works ("WGW") has been manufacturing quality denim products for over 90 years.  WGW produced private label jeans, but eventually developed the Silver Jeans

brand of denim products, primarily jeans, and sold them as a wholesaler to leading retailers throughout Canada and the United States, and, eventually, the world.  WGW owns and holds all rights to the name "Silver Jeans," the trademarks and other intellectual property relevant to the brand, including, without limitation, the website "www.silverjeans.com." (WGW licensed the Debtor to use certain trade names and trademarks, but those licenses were terminated prior to the filing of the petition).

6.      The Debtor was formed to operate a traditional retail business consisting of mall stores featuring "Silver" brand jeans and related clothing.  The Debtor originally operated one store, in Denver, Colorado, now closed.

7.      In 2011, with the support of WGW, the Debtor decided to more fully launch a retail business, with a plan to open five stores at selected premium malls across the United States.  The Debtor would eventually open six stores, and, as of the date of the filing of the petition, was operating five stores in leased space in premium malls:  three in Texas, one in California, and one in Illinois (suburban Chicago).[2]

8.      In connection with this expansion, the Debtor also opened a headquarters operation in Burbank, California (the "HQ Office").  The Debtor, just prior to the filing of the petition, employed five (5) people at the HQ Office.  Overall, the Debtor employed forty-four (44) people, including full- and part-time employees at the stores.

9.      The stores were originally projected to generate "four-wall" profits in the first year.  However, as a result of both internal and external factors, including the extremely slow economic recovery in the United States and the resulting lack of disposable income in the target

---

[2] Prior to the Petition Date, the Debtor operated an additional store located in the Mall of America.  The Debtor sold all of the assets located at the Mall of America store to Silver Jeans Retail, Inc., or an affiliate of WGW, pursuant to that certain Asset Purchase and Sale Agreement dated June 18, 2014.  Pursuant to that agreement, among other things, Silver Jeans Retail, Inc. assumed all debt and other obligations of the Debtor related to that store, including all obligations under the Debtor's lease.

demographic, as well as steep competition from more established brands like Lucky and True Religion, the stores have never been profitable. Operating losses in 2014 are expected to exceed $2.8 million.

10.     The Debtor has largely survived to date on credit extended by WGW, its principal supplier of inventory. As of July 5, 2014, WGW was owed $7,153,022.00 by the Debtor. However, the Debtor is simply not viable, given the high costs of operating the retail stores (including rent) and the low sales volumes which are not expected to improve materially in the near or medium-term. WGW is no longer willing to support the Debtor's operations, other than to allow a liquidation and wind-down of the operations in chapter 11, and there is no other source of capital or financing to support the operations.

11.     The Debtor attempted to negotiate the termination of its leases with its landlords upon terms that would avoid the need to seek relief under chapter 11 and, *inter alia*, reject such leases. However, negotiations with the landlords were ultimately unsuccessful.

12.     Accordingly, the Debtor filed this chapter 11 case to facilitate the orderly liquidation of its assets in a fashion that will maximize the value thereof, thus creating the largest possible return to creditors. The Debtor will initially retain most of its employees to assist in the Store Closing Sales and to wind-down the Debtor's business.

13.     The Debtor's primary assets include rights under leases, inventory, furniture and fixtures, and accounts receivable for goods sold. The Debtor plans to reject the leases at the five retail locations.

14.     The Debtor has no secured debt. All of the claims against the Debtor consist of administrative claims for goods delivered within the twenty days before the filing, priority claims, and unsecured claims, the largest of which is held by WGW (and which will also consist

of lease rejection claims once the leases are rejected, assuming such rejection is approved by the Court).

15.     Prior to the filing, the Debtor also solicited bids for the purchase of its inventory, or for an agency agreement to conduct Store Closing Sales, from WGW, Gordon Brothers Group, LLC ("Gordon Brothers"), Division Six Sports, Inc. ("Division Six"), and Hilco.  WGW and Gordon Brothers were not interested in a purchase or agency agreement.  Hilco proposed an agency agreement arrangement with a guaranteed return to the Debtor, described below (as defined above, the "Agency Agreement").  Division Six offered to acquire certain inventory, but at a price far less favorable than that of the Agency Agreement.  Accordingly, the Debtor entered into the Agency Agreement as of July 19, 2014.

16.     The Debtor filed this chapter 11 case to facilitate the orderly liquidation of its assets in a fashion that will maximize the value thereof, thus creating the largest possible return to creditors.

17.     **Relief Requested**

18.     By this Motion and pursuant to section 105(a), 363, 365, and 554 of the Bankruptcy Code, the Debtor seeks a final order (a) authorizing the Debtor's assumption of the Agency Agreement (and each of the transactions contemplated thereby, including, without limitation, the granting of liens and security interests to Hilco); (b) authorizing the Debtor to commence Store Closing Sales in accordance with the Agency Agreement and Sale Guidelines, with such sales to be free and clear of all liens, claims, interests and encumbrances; (c) authorizing the Debtor to abandon unsold merchandise, furniture, fixtures and equipment ("FF&E") or other assets (collectively, the "Assets") at the Closed Stores following the conclusion of the Store Closing Sales; and (d) granting such further and other relief as the Court

may deem appropriate.

**Basis for Relief Requested**

A.        **The Debtor's Prepetition Solicitation Efforts**

19.        As discussed more fully above, the Debtor currently does not have sufficient cash resources or committed financing to operate its business and service its existing lease and other obligations.  The Debtor explored and considered a number of possible restructuring options, and, in addition, negotiated with its landlords in an effort to avoid the need to file chapter 11. Unfortunately, those negotiations failed.  The Debtor's financial condition continued to deteriorate to the point that it can no longer operate in the ordinary course without immediate access to additional financing.  Unfortunately, the Debtor's assets and cash flow can only collateralize additional financing to support an orderly liquidation.  Thus, the Debtor is left with no choice but to immediately commence the Store Closing Sales at all of its retail locations.

20.        In light of that lack of viability, the Debtor sought proposals from Gordon Brother Group, LLC, Division Six Sports, Inc., and Hilco.  All three companies signed non-disclosure agreements and Hilco and Division Six Sports, Inc. provided proposals to the Debtor to buy the Debtor's inventory or to conduct Store Closing Sales.  The Debtor contacted each company to discuss the terms of their proposals and engaged in extensive negotiations as to the specific terms of their offers.  After conducting the negotiations, the Debtor in consultation with its advisors, determined that Hilco's proposal was vastly superior and provides the best possible return to the Debtor and is in the best interest of the Debtor's estate and creditors, particularly given the fact that Hilco has agreed to guaranty a minimum return to the estate.

B.        **The Agency Agreement**

21.        Pursuant to the Agency Agreement, the Agent will advise the Debtor with respect

to the sale of the Debtor's merchandise at its retail stores (collectively, the "Merchandise") and

certain FF&E as set forth more fully below and in the Agency Agreement.

22.    Certain of the significant terms of the Agency Agreement are as follows:

a.    Services.  The Agent will serve as the Debtor's exclusive agent for the limited purpose of conducting the Store Closing Sales and disposing of the Debtor's Assets, in accordance with the terms and conditions of the Agency Agreement.

b.    Sale Term.  The Sale would commence on or about July 20, 2014 (the "Commencement Date"), and conclude no later than August 31, 2014 (the "Sale Termination Date").

c.    Project Management.  During the Sale Term, Agent shall, in collaboration with the Debtor, (i) provide qualified supervisors engaged by Agent to oversee the management of the Stores and the Sale; (ii) determine appropriate point-of-sale and external advertising for the Stores; (iii) determine appropriate pricing and discounts of Merchandise, staffing levels for the Stores, and appropriate bonus and incentive programs, if any, for the Stores' employees; (iv) oversee display of Merchandise for the Stores;(v) to the extent that information is available, evaluate sales of Merchandise by category and sales reporting and monitor expenses; (vi) assist the Debtor in connection with managing and controlling loss prevention and employee relations matters; (vii) provide support in obtaining authorization to conduct the Sale from the appropriate authorities, if necessary and (viii) provide such other related services deemed necessary or appropriate by the Debtor and Agent.

d.    Guaranteed Amount.  Agent will guarantee to the Debtor a minimum recovery of thirty-five percent (35%) of the aggregate Cost Value of the Merchandise.[3]  For Excluded Goods, Agent will sell the Excluded Goods and, in consideration therefor, receive 20% of the gross Proceeds (gross receipts, less applicable sales taxes) from the sale thereof.

e.    Expenses.  Agent will be responsible for the Store-level operating expenses that accrue and are attributable to the period of the Sale Term, limited to, among others:

i.    Payroll for the Stores' retained employees;

ii.    Payroll taxes and benefits for the Stores' retained employees

---

[3] The following description of certain of the significant terms of the Agency Agreement is a summary of the terms of the Agency Agreement.  Capitalized terms not otherwise defined in this Motion have the meaning ascribed to them in the Agency Agreement.  To the extent that there is any disagreement between the summary set forth herein and the Agency Agreement, the terms of the Agency Agreement shall control.  Parties are urged to read the Agency Agreement attached to the Approval Order.

(excluding Excluded Payroll Benefits);

   iii.   Occupancy Expenses under applicable occupancy agreements on a per diem basis up and limited to the categories and amounts set forth on an exhibit to be agreed to by the parties;

   iv.   Retention bonuses to retained employees;

   v.   Advertising and promotional costs;

   vi.   Signage and banners;

   vii.   Credit card fees and discounts  and chargebacks attributable to the Sale;

   viii.   Agent's attorneys' fees, insurance and other transaction costs;

   ix.   Store cash theft and other store cash shortfalls in the registers; and

   x.   The actual cost and expenses of providing such additional services which Agent deems appropriate for the Sale.

f.   <u>FF&E</u>.  Agent will sell FF&E and, in consideration therefor, receive 20% of the gross Proceeds (gross receipts, less applicable sales taxes) from the sale thereof, plus reimbursement of expenses incurred in connection with selling the FF&E in accordance with a mutually agreed upon budget.  Agent shall be entitled to abandon in place any unsold FF&E.

g.   <u>Compensation to Agent</u>.  After Proceeds are used to repay Agent for amounts paid on account of the Guaranteed Amount and to pay Expenses, all remaining Proceeds shall be retained by Agent.

h.   <u>Payment.</u>  On the second business day following entry of the Approval Order, Agent shall pay to Debtor an amount equal to seventy percent (70%) of the estimated Guaranteed Amount (based upon Merchant's books and records maintained in the ordinary course as of the date immediately preceding the Payment Date) (reduced by any amounts paid prior to the payment of the Initial Guaranty Payment).  The balance of the Guaranteed Amount, if any, shall be paid by Agent to the Debtor's Account 30 days after the Sale Termination Date, subject to the Final Inventory Report.

i.   <u>Security.</u>  To secure Agent's payment of the balance of the Guaranteed Amount and Expenses, no later than the Payment Date, Agent shall furnish the Debtor with an irrevocable standby Letter of Credit naming the Debtor as beneficiary in the aggregate original face amount equal to the sum of: (a) thirty percent (30%) of the estimated Guaranteed Amount (based upon Merchant's books and records

maintained in the ordinary course), plus (b) the parties' mutually agreed upon estimate of two weeks of Expenses.

j.   Sale Guidelines.  The Sales shall be conducted in accordance with the Sale Guidelines attached to the Agency Agreement as Exhibit 8.1.  The Agent shall be authorized to advertise and promote the sales as a "going out of business," "store closing," "sale on everything" or similarly themed sale.

k.   Security Interest.  To secure the obligations of the Debtor to the Agent, the Agent is granted a first-priority security interest in the Debtor's assets that are subject to liquidation.

C.    **Approval of Store Closing Sales Under Section 363**

23.    Section 363(b) of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . ."  *See* 11 U.S.C. § 363(b)(1); *see also* In re Ames Dept. Stores, Inc. (Ames I), 136 B.R. 357, 359 (Bankr. S.D.N.Y. 1992) (noting that "going-out-of-business" sales are governed by section 363(b)); Fed. R. Bankr. P. 6004(f)(1) ("All sales not in the ordinary course of business may be by private sale or by public auction."). Moreover, section 105(a) of the Bankruptcy Code provides that "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

24.    The decision to sell assets outside the ordinary course of business is based upon the sound business judgment of the debtor. *See, e.g.,* In re Chateaugay Corp., 973 F.2d 141, 145 (2d Cir. 1992); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983) ("The rule we adopt requires that a judge determining a § 363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application."); *see also* Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992) (stating

"the business judgment rule is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company," and has continued applicability in bankruptcy) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)), appeal dismissed, 3 F.3d 49 (2d Cir. 1993); Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct.") (citation omitted).

25.     When a valid business justification exists, the law vests the debtor's decision to use property out of the ordinary course of business with a strong presumption "'that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'" In re Integrated Res., Inc., 147 B.R. at 656 (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)). Accordingly, parties challenging a debtor's decision must make a showing of "bad faith, self-interest or gross negligence." Id. (citations omitted).

26.     Store closing or liquidation sales are a routine occurrence in chapter 11 cases involving retail debtors. See Ames Dept. Stores, Inc. (Ames I), 136 B.R. at 359 (holding that "going-out-of-business" sales are an important part of "overriding federal policy requiring [a] Debtor to maximize estate assets"); see also In re Ames Dept. Stores, Inc. (Ames II), Ch. 11 Case No. 01-42217 (REG) (Bankr. S.D.N.Y. Aug. 20, 2001) (approving store closing sales and agency agreement on first day). Bankruptcy Courts have routinely approved similar requests by debtors to conduct store closing sales, finding the debtor's requested relief consistent with

applicable provisions of the Bankruptcy Code. *See, e.g.,* <u>The Great Atlantic & Pacific Tea Co., Inc.</u>, Case No. 10-24549 (RDD) (Bankr. S.D.N.Y. Mar. 10, 2011); <u>In re Blockbuster Inc.</u>, Ch. 11 Case No. 10-14997 (BRL) (Bankr. S.D.N.Y. Jan. 20, 2011); <u>In re Movie Gallery, Inc.</u>, Ch. 11 Case No. 10-30696 (Bankr. E.D. Va. Feb. 4, 2010); <u>In re Finlay Enters., Inc.</u>, Ch. 11 Case No. 09-14873 (JMP) (Bankr. S.D.N.Y. Sept. 25, 2009); <u>In re Goody's LLC</u>, Ch. 11 Case No. 09-10124 (Bankr. D. Del. Jan. 21, 2009) (authorizing debtors' assumption of prepetition agency agreement and to conduct store closing sales); <u>In re Circuit City Stores, Inc.</u>, Ch. 11 Case No. 08-35653 (KRH) (Bankr. E.D. Va. Nov. 10, 2008); <u>In re Linens Holding Co.</u>, Ch 11 Case No. 08-10832 (Bankr. D. Del. May 30, 2008) (approving store closing sales of certain closing locations), (Bankr. Del. Oct.16, 2008) (approving store closing sales for all remaining store locations); <u>In re Sharper Image Corp.</u>, Ch. 11 Case No. 08-10322 (Bankr. D. Del. Mar. 14, 2008); <u>In re Steve & Barry's Manhattan LLC</u>, Ch. 11 Case No. 08-12579 (ALG) (Bankr. S.D.N.Y. Aug. 22, 2008).

### B.    <u>Selling Assets Free and Clear of Liens, Claims, Interests and Encumbrances</u>

27.    The Debtor requests approval to sell assets subject to the Agency Agreement on a final "as is" basis, free and clear of any and all liens, claims, interests and encumbrances in accordance with section 363(f) of the Bankruptcy Code. A debtor-in-possession may sell property under sections 363(b) and 363(f) "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied: applicable non-bankruptcy law permits sale of such property free and clear of such interest; such entity consents; such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; such interest is subject to a bona fide dispute; or such entity could be compelled, in a legal or equitable proceeding, to accept a

money satisfaction of such interest.  11 U.S.C. § 363(f)(1)-(5); <u>Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)</u>, 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that since section 363(f) is written in the disjunctive, the court may approve a sale free and clear if anyone subsection is met).

28.    The Debtor does not have any secured debt.  As part of the first day motions, the Debtor will seek to grant a lien to WGW to secure post-petition advances as required.  However, that lien will be subordinate to the lien of Hilco under the Agency Agreement, and WGW consents to all sales under the Agency Agreement, with liens to attach to the proceeds thereof in accordance with their respective priorities.

29.    With respect to any other party asserting a lien or encumbrance against the Assets—although the Debtor is not aware of any such lien or encumbrance--the Debtor will be able to satisfy one or more of the conditions set forth in section 363(f).  In connection with the sale of the Assets pursuant to the terms and conditions of the Agency Agreement, the Debtor proposes that any liens or encumbrances asserted against the Assets be transferred to and attach to the amounts payable to the Debtor under the Agency Agreement, in the same order of priority and subject to the rights, claims, defenses, and objections, if any, of all parties with respect thereto.

30.    Accordingly, the Debtor submits that, to the extent applicable, the Court should authorize the Debtor to sell the Assets free and clear of any liens, claims, encumbrances, or other interests that may exist, with any of the same to be transferred and attached to the net proceeds of the sale, with the same validity and priority that such liens, claims, encumbrances, or interests had against the Debtor's assets.

C.    **Approving the Assumption of the Agency Agreement**

31.    Section 365(a) of the Bankruptcy Code provides that a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease." 11 U.S.C. § 365(a).  A debtor's determination to assume or reject an executory contract is governed by the "business judgment" standard. *See, e.g.*, Trak Auto Corp. v. Ramco-Gershenson (In re Trak Auto Corp.), 2002 Bankr. LEXIS 938 (Bankr. E.D. Va. Jan. 9, 2002) ("The traditional test courts use to evaluate a debtor's decision to assume an unexpired lease is that of business judgment." (citing N.L.R.B. v. Bildisco, 465 U.S. 513 (1984))); In re HQ Global Holdings, Inc., 290 B.R. 507, 511 (Bankr. D. Del. 2003) (stating that a debtor's decision to reject an executory contract is governed by the business judgment standard and can only be overturned if the decision was the product of bad faith, whim, or caprice).

32.    In applying the "business judgment" standard, courts show great deference to the debtor's decision to assume or reject.  *See* Summit Land Co. v. Allen (In re Summit Land Co.), 13 B.R. 310, 315 (Bankr. D. Utah 1981) (absent extraordinary circumstances, court approval of debtor's decision to assume or reject executory contract "should be granted as a matter of course"); In re Trak Auto Corp., 2002 Banta. LEXIS 938 at *4 ("While review of debtor's proposal is highly deferential to debtor's wishes, the Court must also consider all of the circumstances surrounding any particular assumption or rejection.").

33.    Once the debtor articulates a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." In re Integrated Res., Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)).   In addition,

consideration is given to (1) the effect of debtor's proposed assumption or rejection upon debtor's estate; (2) how the [counterparty] is affected by the assumption or rejection of its [agreement]; (3) whether any benefit or harm to the unsecured creditors arises from the assumption or rejection of the subject [agreement]; and (4) the significance of the [agreement] to debtor's overall reorganization efforts. In re Trak Auto Corp., 2002 Bankr LEXIS 938 at *8-9; see In re Washington Capital Aviation & Leasing, 156 B.A. 167, 171 (Bankr. E.D. Va. 1993).

34.    In this instance, as set forth above, this Court should find that the Debtor has exercised its reasonable business judgment in seeking to assume the Agency Agreement.  The Debtor believes that the Agency Agreement will provide the Debtor and its stakeholders with several benefits.  First, allowing the Agent to sell the Assets in the manner described herein will enable the Debtor to maximize returns in a short time.   In addition, as noted above, it is generally more cost-effective for a liquidation agent, with its substantial experience, to conduct these sales, rather than the Debtor.  Finally, the Agency Agreement will provide the Debtor with a guaranteed return for the Merchandise. This arrangement will minimize the Debtor's risk, while motivating the Agent to maximize proceeds from the Store Closing Sales.

35.    The Debtor was free to deal with any other party interested in liquidating some or all of the Debtor's assets.  Hilco is not an "insider" as that term is defined in section 101(31) of the Bankruptcy Code.  No common identity of directors or controlling stockholders exists between the Hilco and the Debtor.

36.    Because the Agency Agreement was negotiated at arm's-length and in good faith after other qualified parties and their qualifications and proposals were considered, this Court should find that Hilco has acted in good faith within the meaning of section 363(m) of the Bankruptcy Code.

37.     Based on the foregoing, the Debtor (a) believes that entering into the Agency Agreement is in its best interests and the best interests of the Debtor's stakeholders, and (b) respectfully requests authorization to assume the Agency Agreement pursuant to its terms.

**D.     Grant of a Security Interest in and Lien Upon the Merchandise and Proceeds of the Sale**

38.     Pursuant to the Agency Agreement, the Debtor will grant the Agent a first priority security interest in and lien upon the Merchandise and the Proceeds to secure all obligations of the Debtor and the Agent thereunder (the "Agent Security Interest"). The Debtor submits that the Agent Security Interest provided in the Agency Agreement should be properly perfected without the need for further filings or further documentation. Without in any way diminishing the foregoing, the Debtor shall execute all such documents and take all such other actions as are reasonably required to perfect and maintain such security interest as a valid and perfected first priority security interest. The liens, claims and security interests and other protections granted to the Agent thereunder shall continue (including in any successor case) and shall maintain their priority until all of Debtor's obligations to the Agent shall have been indefeasibly paid in full.

39.     The Agent's extension of credit under the Agency Agreement and the other financial accommodations set forth therein, constitute the extension of credit in good faith under section 364(e) of the Bankruptcy Code and, accordingly, the reversal or modification on appeal of this Court's authorization to consummate the transactions contemplated by the Agency Agreement should not affect the validity of such transactions, unless properly stayed pending appeal.

40.     The Debtor submits that the consideration provided by the Agent pursuant to the Agency Agreement constitutes reasonably equivalent value and fair consideration under the

Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act and under the laws of the United States, and any state or territory, possession or the District of Columbia.

### E. Waiver of Contractual Restriction and Exemption of Fast Pay Laws and Laws Restricting Store Closing Sale

41.     The Debtor respectfully requests waiver of certain contractual or applicable law restrictions that could otherwise inhibit or prevent the Debtor's ability to maximize recovery through the Store Closing Sales, and which are customarily waived in sales such as these.

### i. Waiver of Contractual Restrictions

42.     The Debtor requests that the Court override or invalidate any provisions in the Debtor's lease agreements restricting store closing sales (the "Contractual Restrictions") that may impair the Debtor's ability to close stores and conduct the Store Closing Sales. The stores subject to the Store Closing Sales are located on properties that are leased by the Debtor.  In certain cases, the contemplated Store Closing Sales may be inconsistent with certain provisions of such leases, subleases, or other documents with respect to any such leased premises, including (without limitation) reciprocal easement agreements, agreements containing covenants, conditions and restrictions (including, without limitation, "go-dark" provisions and landlord recapture rights), or other similar documents or provisions.

43.     Store closing or liquidation sales are a routine part of chapter 11 cases involving retail debtors.  Such sales are consistently approved by courts despite provisions of recorded documents or agreements purporting to forbid such sales.  Indeed, other such restrictive provisions in contracts have been deemed unenforceable in other chapter 11 cases as impermissible restraints on a debtor's ability to maximize the value of its assets under section 363 of the Bankruptcy Code.  *See* In re Blockbuster Inc., Ch. 11 Case No. 10-14997 (BRL)

16

(Bankr. S.D.N.Y. Jan. 20, 2011) at ¶¶ 7, 8; In re Finlay Enters., Inc., Ch. 11 Case No. 09-14873

(JMP) (Bankr. S.D.N.Y. Sept. 25, 2009) at ¶ 14; In re Steve & Barry's Manhattan LLC, Ch. 11

Case No. 08-12579 (ALG) (Bankr. S.D.N.Y. Aug. 22, 2008) at ¶¶ 32, 33; In re Bradlees Stores,

Inc., Case No. 00-16035 (BRL) (Bankr. S.D.N.Y. Jan. 4, 2001) (authorizing debtor to conduct

store closing sales notwithstanding state rules or statutes governing closing, liquidation, or

"going-out- of-business" sales and notwithstanding provision in leases restricting debtor's ability

to conduct such sales); In re R.H. Macy & Co., 170 B.R. 69, 77 (Bankr. S.D.N.Y. 1994)

(holding restrictive lease provision unenforceable against debtor that sought to conduct going-

out-of-business sale "because it conflicts with the Debtor's fiduciary duty to maximize estate

assets"); Ames Dept' Stores, Inc. (Ames I), 136 B.R. at 359 (finding that "to enforce the anti-

GOB sale clause of the [l]ease would contravene overriding federal policy requiring debtors to

maximize estate assets by imposing additional constraints never envisioned by Congress"); see

also In re Tobago Bay Trading Co., 112 B.R. 463, 467 (Bankr. N.D. Ga. 1990) (finding anti-

going-out-of-business sales clause in lease unenforceable).

44.    The Court should ensure that no Contractual Restriction is an impediment to the

Store Closing Sales, closures of Closing Stores, or the activities in connection therewith. To the

extent such Contractual Restrictions exist, they should not be permitted to interfere with, or

otherwise restrict the Debtor from conducting, the Store Closing Sales or the closing of any

Closing Stores.

### ii. Exemption From Applicable Law Restrictions

45.    Certain states in which the Closing Stores are located have or may have

licensing and other requirements governing the conduct of store closing, liquidation, or other

inventory clearance sales, including (but not limited to) state, and local laws, statutes, rules,

regulations, and ordinances related to store closing and liquidation sales, establishing licensing,

permitting, or bonding requirements, waiting periods, time limits, bulk sale restrictions, augmentation limitations that would otherwise apply to the Store Closing Sales, or consumer fraud laws, with the exception of deceptive advertising laws (the "Liquidation Sale Laws"). Typical statutes and regulations provide that if a liquidation or bankruptcy sale is court authorized, however, then a company need not comply with these Liquidation Sale Laws.

46.    The Debtor, therefore, requests that the Court authorize the Debtor to conduct the Store Closing Sales without the necessity of, and the delay associated with, complying with the Liquidation Sale Laws.  Because the Debtor and its assets are subject to this Court's jurisdiction, *see* 28 U.S.C. § 1334, this Court will be able to supervise the Store Closing Sales. The Store Closing Sales are legitimate methods by which the Debtor can maximize the return from the sale of the Merchandise for the benefit of its estate and creditors. Moreover, creditors and the public interest are adequately protected by the jurisdiction and supervision of this Court.

47.    Even if a state or local law does not expressly except bankruptcy sales from its ambit, the Debtor submits that, to the extent that such state or local law conflicts with federal bankruptcy laws, it is preempted by the Supremacy Clause of the United States Constitution. To hold otherwise would severely impair the relief otherwise available under section 363 of the Bankruptcy Code.  In concert with this premise, bankruptcy courts have consistently recognized that federal bankruptcy law preempts state and local laws that contravene the underlying policies of the Bankruptcy Code. See, e.g., Aloe v. Shenango Inc. (In re Shenango Group, Inc.), 186 B.R. 623, 628 (Bankr. W.D. Pa. 1995) ("Trustees and debtors-in- possession have unique fiduciary and legal obligations pursuant to the bankruptcy code. . . . [A] state statute [ ] cannot place burdens on them where the result would contradict the priorities established by the federal bankruptcy code.").  While preemption of state law is not always appropriate, as

when the protection of public health and safety is involved, *see* <u>Baker & Drake, Inc. v. Pub. Serv. Comm'n of Nev. (In re Baker & Drake, Inc.)</u>, 35 F.3d 1348, 1353-54 (9th Cir. 1994) (finding no preemption when state law prohibiting taxicab leasing was promulgated in part as a public safety measure), it is appropriate when, as here, the only state laws involved concern economic regulation. <u>Id.</u> at 1353 (finding that "federal bankruptcy preemption is more likely . . . where a state statute is concerned with economic regulation rather than with protecting the public health and safety"). Moreover, pursuant to section 105 of the Bankruptcy Code, the Court has the authority to permit the Store Closing Sales to proceed notwithstanding contrary Liquidation Sale Laws. *See* 11 U.S.C. § 105(a).

48.     Here, section 363 of the Bankruptcy Code, which requires the Debtor to operate its business in a way that maximizes recoveries for creditors, will be undermined if the Court does not provide for the waiver of the Liquidation Sale Laws because the Liquidation Sale Laws constrain the Debtor's ability to marshal and maximize assets for the benefit of creditors. Similar relief has been granted in this and other bankruptcy cases in other jurisdictions. *See, e.g.*, <u>In re Blockbuster Inc.</u>, Ch. 11 Case No. 10-14997 (BRL) (Bankr. S.D.N.Y. Jan. 20, 2011) at 9, 10; <u>In re Finlay Enters., Inc.</u>, Ch. 11 Case No. 09-14873 (JMP) (Bankr. S.D.N.Y. Sept. 25, 2009) at ¶ 11; <u>In re Steve & Barry's Manhattan LLC</u>, Ch 11 Case No. 08-12579 (ALG) (Bankr. S.D.N.Y. Aug. 22, 2008) at ¶ 36.

49.     Importantly, given the supervision of this Court, the requested waiver will not unduly undermine state and local requirements that would otherwise apply to the Store Closing Sales.  The Debtor only requests that this Court authorize the Debtor to conduct the Store Closing Sales without the necessity of, and the delay associated with, obtaining various state licenses or permits, observing state and local waiting periods or time limits, and/or

satisfying any additional requirements with respect to advertising, conducting the Store Closing

Sales as store closings or similar type sales, or transferring merchandise to the Closing Stores.

The Debtor fully intends to be bound by and comply with remaining statutes and regulations,

such as health and safety laws, as well as the Sale Guidelines. The Debtor also requests that no

other person or entity, including (but not limited to) any lessor or federal, state, or local agency,

department, or governmental authority, be allowed to take any action to prevent, interfere with,

or otherwise hinder consummation of the Store Closing Sales, or the advertising and promotion

(including through the posting of signs) of Store Closing Sales, in the manner set forth in the

proposed Approval Order.

### iii. Exemption From State "Fast Pay" Laws and Regulations

51.    At least one of the states in which the Debtor operates has laws and regulations

that require the Debtor to pay an employee substantially contemporaneously with his or her

termination.[4] In many cases, these laws require the payment to occur either immediately or

within a period of only a few days from the date such employee is terminated. The

comprehensive nature of the Store Closing Sales contemplated by this Motion will result

in certain employees being terminated during the Store Closing Sales. Even though the Debtor

has only forty-four employees, processing payroll in a manner that will be strictly compliant with

these state laws and regulations will be unduly burdensome and only add to the cost of the wind-

down.

52.    As set forth above, the Bankruptcy Code preempts state and local laws that

conflict with its underlying policies. Preemption is appropriate where, as here, the only state

laws involved concern economic regulation rather than the protection of public health and

---

[4] For example, California Labor Code § 201(a) provides, in pertinent part, that "[i]f an employer discharges an employee, the wages earned and unpaid at the time of discharge are due and payable immediately."

07/21/2014 SL1 1314141v1 108992.00001

safety.

53.     Under ordinary circumstances, the Debtor would be able to pay individual store-level employees immediately upon termination and reconcile the payment amount after the fact. However, given the number of employees who will be terminated during the Store Closing Sales, this will be difficult and unnecessarily time-consuming. It would be necessary to have the Debtor's payroll department calculate individual termination payments, prepare each termination payment check, obtain authorization for each such check and then prepare each such check for hand-delivery or mailing. With employee terminations on the scale necessitated by the Store Closing Sales, this process could take significant time and effort, and the Debtors will be operating with only very limited central office support.

54.     To be clear, the Debtor intends to pay its terminated employees as expeditiously as possible and under normal payment procedures. However, the requirements imposed by these state laws and regulations are unworkable in these extraordinary circumstances. If the Debtor is required to comply with these state laws and regulations, its efforts to wind down its operations and stem unnecessary payroll costs will be hampered. Indeed, if forced to comply, the Debtor will face the choice of (a) having to incur the costs of keeping employees "employed" after the conclusion of a Sale while payroll is prepared or (b) staging terminations to the detriment of the wind-down and Debtor's estate. Both of these choices will provide no benefit to the Debtor's estate and will only increase the administrative costs of conducting the Store Closing Sales.

55.     Accordingly, the Debtor respectfully submits that in this instance, so-called "Fast Pay Laws" are at odds with the underlying policies of the Bankruptcy Code and as such, the Debtor should be granted relief from their requirements. *See* <u>In re Linens</u>

Holding Co., Ch. 11, Case No. 08- 10832 (Bankr. D. Del. Oct. 28, 2008) (waiving "fast pay"

laws and regulations in connection with approval of store closing sales).

      F.      **Authority to Abandon Unsold Property Following Store Closing Sales**

      55.      Section 554(a) of the Bankruptcy Code provides that after notice and a hearing,

the trustee, and therefore the debtor in possession, "may abandon any property of the estate that

is burdensome to the estate or that is of inconsequential value and benefit to the estate." *See*

Hanover Ins. Co. v. Tyco Indus., Inc., 500 F.2d 654, 657 (3d Cir. 1974) (a trustee "may abandon

his claim to any asset, including a cause of action, he deems less valuable than the cost of

asserting that claim"); In re Grossinger's Assoc., 184 B.R. 429, 432 (Bankr. S.D.N.Y.

1995); *see also* Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Protection, 474 U.S.

494, 507, n.9 (1986) ("[A] trustee [in bankruptcy] may not abandon property in

contravention of a state statute or regulation that is reasonably designed to protect the public

health or safety from identified hazards . . . This exception to the abandonment power . . . is a

narrow one."); In re Bryson, 53 B.R. 3, 4-5 (Bankr. M.D. Tenn. 1985) ("The effect of the

abandonment is to remove the asset from the jurisdiction of the bankruptcy court.").

      56.      Under the Agency Agreement, any Merchandise remaining at the Closing Stores

following the Store Closing Sales can be sold by the Agent, with the proceeds thereof treated as

Proceeds for purposes of compensation computation. To the extent, however, that the Agent

does not sell certain owned FF&E, the Debtor requests that it be authorized upon the

conclusion of the Store Closing Sales to abandon the same without incurring liability to any

person or entity. The Debtor submits that if it is unable to sell or dispose of any such assets

following the Store Closing Sales, the costly and burden to the estate to retain or remove them

would greatly outweigh any value they might have, and thus abandoning them in place is in the

best interest of the estate.

57.    Notwithstanding the foregoing, the Debtor and the Agent will utilize all commercially reasonable efforts to remove or cause to be removed any confidential or personal identifying information (which means information which alone or in conjunction with other information identifies an individual, including, but not limited to, an individual's name, social security number, date of birth, government-issued identification number, account number, and credit or debit card number) in any of the Debtor's hardware, software, computers or cash registers or similar equipment that are to be sold or abandoned.

**No Prior Request**

58.    No prior request for the relief requested herein has been made to this Court or any other court.

**Notice**

59.    Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (i) the Office of the United States Trustee for the District of Delaware; (ii) counsel to Hilco; (iii) the Debtor's landlords (iv) the applicable federal and state taxing authorities; (v) the parties included on the Debtor's list of twenty (20) largest creditors; (vi) those parties requesting notice pursuant to Bankruptcy Rule 2002; (vii) all state attorneys general; and (viii) all parties entitled to notice pursuant to Local Bankruptcy Rule 9013-1(m).  The Debtor submits that no other or further notice is necessary or required.

07/21/2014 SL1 1314141v1 108992.00001

### Conclusion

WHEREFORE, the Debtor respectfully requests the entry of an order, substantially in the form annexed hereto as **Exhibit 1**, granting the relief requested herein and such other and further relief as the Court may deem just and proper.

Dated: July 21, 2014                                        Respectfully submitted,

                                                            */s/ Joseph H. Huston, Jr.*
                                                            Joseph H. Huston, Jr. (No. 4035 )
                                                            STEVENS & LEE, P.C.
                                                            1105 North Market Street, Suite 700
                                                            Wilmington, Delaware 19801
                                                            Tel: (302) 425-3310
                                                            Fax: (610) 371-7927
                                                            Email: jhh@stevenslee.com

                                                                    and

                                                            Robert J. Keach, Esq.
                                                            Roma N. Desai, Esq.
                                                            Timothy J. McKeon, Esq.
                                                            BERNSTEIN, SHUR, SAWYER & NELSON
                                                            100 Middle Street
                                                            P.O. Box 9729
                                                            Portland, ME 04104-5029
                                                            Tel: (207) 774-1200
                                                            Fax: (207) 774-1127
                                                            Email: rkeach@bernsteinshur.com
                                                                   rdesai@bernsteinshur.com
                                                                   tmckeon@bernsteinshur.com