IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------x
:  Chapter 11
In re:  :
:  Case No. 14-11763 (MFW)
SJC, Inc.  :
:
Debtor.[1]  :
:
------------------------------------x

### DECLARATION OF SCOTT MERRELL IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY MOTIONS

I, SCOTT MERRELL, declare, pursuant to section 1746 of title 28 of the United States Code, that:

1. I am the President of the above-captioned debtor (the "Debtor," "SJC" or the "Company"). I am authorized to submit this Declaration in support of the Debtor's chapter 11 petition and the first day pleadings described herein. I am familiar with the Debtor's day-to-day operations, business and financial affairs.

2. I have been one of two directors of the Debtor since the Company was incorporated in Delaware in 2007.

3. On July 21, 2014 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware. The same day, the following motions were filed on behalf of the Debtor (collectively, the "First Day Motions"):

---

[1] The last four digits of the Debtor's taxpayer identification number are 8350. The Debtor's corporate headquarters are located at Burbank, California.

a. Debtor's Motion for an Order Authorizing the Debtor to Pay Prepetition Wages, Compensation, Employee Benefits, and Other Associated Obligations (the "Payroll Motion");

b. Debtor's Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 362 and 364 (A) Authorizing the Debtor to Obtain Post-Petition Financing, (B) Granting Security Interests to the DIP Lender, (C) Modifying the Automatic Stay, (D) Scheduling a Final Hearing, and (E) Granting Related Relief Motion (the "Borrowing Motion");

c. Debtor's Motion for an Order (A) Authorizing the Maintenance of Bank Accounts and Continued Use of Existing Business Forms and Checks; and (B) Authorizing the Continued Use of Existing Cash Management Systems (the "Cash Management Motion");

d. Debtor's Motion for an Order under 11 U.S.C. § 521 Extending the Debtor's Deadline to File Schedules of Assets and Liabilities and Statements of Financial Affairs (the "Schedules Motion");

e. Debtor's Motion for Interim and Final Orders Authorizing the Debtor to Pay Certain Prepetition Taxes and Related Obligations (the "Taxes Motion");

f. Debtor's Motion for an Order Authorizing the Debtor to Maintain Insurance Policies, Pay All Policy Premiums and Brokers' Fees Arising Thereunder, and Renew or Enter Into New Policies (the "Insurance Motion");

g. Debtor's Motion for an Order Authorizing the Debtor to Honor Certain Prepetition Obligations to Customers and to Otherwise Continue Certain Customer Practices and Programs in the Ordinary Course of Business (the "Customer Programs Motion"); and

h. Debtor's Motion for Order Pursuant to 11 U.S.C. §§ 105, 363, 364, 365, and 554 (I) Approving Assumption of Agency Agreement (II) Approving Store Closing Sales, (III) Authorizing the Debtor to Abandon Property, and (IV) Granting Related Relief (the "Agency Agreement Motion").

4.  On or about July 21, 2014, the following additional motions were filed on behalf of the Debtor but are not scheduled to be heard with the First Day Motions (collectively, the "Second Day Motions"): :

a. Debtor's Application for Order Pursuant to Bankruptcy Code Sections 327, 328, and 329, Bankruptcy Rules 2014 and 2016, and Local Bankruptcy Rules 2014-1 and 2016-1 Authorizing the Employment and Retention of Bernstein, Shur, Sawyer & Neslon, P.A. as General Bankruptcy Counsel, *Nunc Pro Tunc* to the Petition Date (the "BSSN Application");

b. Debtor's Application for Order Pursuant to Bankruptcy Code Sections 327, 328, and 329, Bankruptcy Rules 2014 and 2016, and Local Bankruptcy Rules 2014-1 and 2016-1 Authorizing the Employment and Retention of Stevens & Lee, P.C. as Local Bankruptcy Counsel, *Nunc Pro Tunc* to the Petition Date (the "S&L Application");

c. Motion for an Order (I) Prohibiting Utilities from Altering, Refusing or Discontinuing Services, (II) Approving the Adequate Assurance Deposits Proposed by the Debtor, and (III) Establishing Procedures for Determining Requests for Additional Adequate Assurance (the "Utilities Motion");

5.  This Declaration is submitted in support of these First Day Motions and the Second Day Motions, which are described in greater detail below.

6.  All facts set forth herein are based on my personal knowledge, on information supplied to me by others within the Debtor's organization, upon my review of relevant documents, or on my opinion based upon my experience and knowledge of the Debtor's operations, financial condition and present liquidity needs. If I were called to testify, I could and would testify competently to the facts set forth herein.

7.  Part I of this Declaration describes the business operations and background of the Debtor, Part II sets forth facts relevant to each of the First Day Motions, and Part III sets forth facts relevant to each of the Second Day Motions.

## I. Description of Debtor's Business and Background

8.  Western Glove Works ("WGW") has been manufacturing quality denim products for over 90 years. WGW produced private label jeans, but eventually developed the Silver Jeans brand of denim products, primarily jeans, and sold such products as a wholesaler to leading

retailers throughout Canada and the United States, and, eventually, the world. WGW owns and holds all rights to the name "Silver Jeans", the trademarks and other intellectual property relevant to the brand, including, without limitation, the website "www.silverjeans.com." (WGW licensed the Debtor to use certain trade names and trademarks, but those licenses were terminated prior to the filing of the petition).

9. The Debtor was formed to operate a traditional retail business consisting of mall stores featuring "Silver" brand jeans and related clothing. The Debtor originally operated one store, in Denver, Colorado, now closed.

10. In 2011, with the support of WGW, the Debtor decided to more fully launch a retail business, with a plan to open five stores at selected premium malls across the United States. The Debtor would eventually open six stores, and, as of the date of the filing of the petition, was operating five stores in leased space in premium malls: three in Texas, one in California, and one in Illinois (suburban Chicago).[2] The Debtor's obligations under ach of the leases at each of the five locations is partially secured by a letter of credit, The locations, the landlord at each location, and the amount of the applicable letter of credit are as follows:

---

[2] Prior to the Petition Date, the Debtor operated an additional store located in the Mall of America. The Debtor sold all of the assets located at the Mall of America store to Silver Jeans Retail, Inc., or an affiliate of WGW, pursuant to that certain Asset Purchase and Sale Agreement dated June 18, 2014. Pursuant to that agreement, among other things, Silver Jeans Retail, Inc. assumed all debt and other obligations of the Debtor related to that store, including all obligations under the Debtor's lease.

4

| Location | Landlord | Amount of Line of Credit |
|---|---|---|
| Glendale Galleria, Glendale CA | Glendale II Mall Associates, LLC | $100,000.00 |
| La Plaza Mall, McAllen, TX | Simon Property Group (Texas), L.P. | $47,389.00 |
| Woodfield Mall, Schaumberg, IL | Woodfield Mall LLC | $55,983.00 |
| Stonebriar Center, Frisco, TX | Stonebriar Mall, LLC | $100,000.00 |
| Woodlands Mall, Woodlands, TX | The Woodlands Mall Associates, LLC | $100,000.00 |

11. In connection with this expansion, the Debtor also opened a headquarters operation in Burbank, California (the "HQ Office"). The Debtor, just prior to the filing of the petition, employed five (5) people at the HQ Office. Overall, the Debtor employed forty-four (44) people, including full- and part-time employees at the stores.

12. The stores were originally projected to generate "four-wall" profits in the first year. However, as a result of both internal and external factors, including the extremely slow recovery in the United States and the resulting lack of disposable income within the target demographic, as well as steep competition from more established brands like Lucky and True Religion, the stores have never been profitable. Cumulative operating losses exceeded $2.8 million as of May 31, 2014.

13. The Debtor has largely survived to date on credit extended by WGW, its principal supplier of inventory. As of July 5, 2014, WGW was owed $7,153,022.00 by the Debtor. However, the Debtor is simply not viable, given the high costs of operating the retail stores (including rent) and the low sales volumes which are not expected to improve materially in the near or medium-term. WGW is no longer willing to support the Debtor's operations, other than

to allow a liquidation and wind-down of the operations in chapter 11, and there is no other source of capital or financing to support the operations.

14. The Debtor attempted to negotiate the termination of its leases with its landlords upon terms that would avoid the need to seek relief under chapter 11 and, *inter alia*, reject such leases. However, negotiations with the landlords were ultimately unsuccessful.

15. Accordingly, the Debtor filed this chapter 11 case to facilitate the orderly liquidation of its assets in a fashion that will maximize the value thereof, thus creating the largest possible return to creditors. As soon as possible after the filing of the petition, the Debtor intends to terminate certain employees, retaining only those necessary to assist in the liquidation of the Debtor's business and assets. The Debtor will initially retain most of its employees, all to assist in going-out-of business sales ("GOB Sales") and to wind-down the Debtor's business.

16. The Debtor's primary assets include rights under leases, inventory, furniture and fixtures, and account receivable for goods sold. The Debtor plans to reject the leases at the five retail locations.

17. The Debtor has no secured debt. All of the claims against the Debtor consist of administrative claims for goods delivered within the twenty days before the filing, priority claims, and unsecured claims, the largest of which is held by WGW (and which will also consist of lease rejection claims once the leases are rejected, assuming such rejection is approved by the Court).

18. Prior to the filing, the Debtor also solicited bids for the purchase of its inventory, or for an agency agreement to conduct GOB Sales, from WGW, Gordon Brothers Group, LLC ("Gordon Brothers"), Division Six Sports, Inc. ("Division Six"), and Hilco Merchant Resources,

LLC ("Hilco"). WGW and Gordon Brothers were not interested in a purchase or agency agreement. Hilco proposed an agency agreement arrangement with a guaranteed return to the Debtor, described below (the "Hilco Agency Agreement"). Division Six offered to acquire certain inventory, but a price for less favorable than the Hilco Agency Agreement. Accordingly, the Debtor entered into the Hilco Agency Agreement on July 19, 2014.

## II. The First Day Motions

19. I have reviewed each of the First Day Motions, including the exhibits thereto, and I believe that the relief sought in each of the motions is necessary if the Debtor is to successfully liquidate in chapter 11. Ultimately, those motions will be critical to the Debtor's ability to achieve a successful process, maximizing the return on its assets.

*A. Payroll Motion*

20. The Debtor has accrued payroll expenses as a result of regular business activity prior to the Petition Date and therefore seeks authorization from this Court to pay certain accrued wages and salaries as well as specified payroll-related expenses.

21. Specifically, the Debtor seeks authorization to make payments for or relating to prepetition compensation (collectively, the "Prepetition Compensation") that will come due and normally be paid out to the employees, taxing authorities, and others on July 25, 2014. The Prepetition Compensation is attributable to work performed in the ordinary course of business for the two-week period ending July 19, 2014. (Payroll after July 19, 2014 is funded by Hilco under the Hilco Agency Agreement). The gross payroll for salaried and hourly employees for such period, based on the prior period's payroll, is $53,363.92, which includes payroll taxes and other necessary withholdings. By the Payroll Motion, the Debtor seeks authorization (i) to pay

the Prepetition Compensation attributable to the two-week period ending July 19, 2014 for hourly and salaried employees; (ii) to pay the service fee payable to Paychex Inc. for such pay period, in the aggregate approximate amount of $1,341.09; and (iii) for its bank to honor checks and/or drafts issued for such Prepetition Compensation.

22. The Debtor also seeks authority to make certain payroll deductions detailed in the Payroll Motion, including defined contribution 401(k) pension plan payments.

23. The Debtor seeks this relief because any delay in paying the Prepetition Compensation will damage the Debtor's relations with its employees and will irreparably harm morale. To maintain and preserve the morale of any continuing labor force while the liquidation of the business is conducted, it is essential that the Debtor be permitted to pay its employees the compensation and deductions accrued prior to the filing. Absent the relief requested by this motion, the Debtor's employees will suffer undue hardship and, in many instances, suffer financial difficulties because these sums are needed to enable them to meet their own personal obligations. Many employees would undoubtedly seek other employment if not paid, and the Debtor could lose critical employees. Moreover, applicable state law may require payment of wage-related claims upon the termination of such employees. No employee will receive, in the aggregate, more than the $12,475 priority amounts allowed under 11 U.S.C. § 507(a)(4) and (5).

*B. Borrowing Motion*

24. The Debtor seeks authority to borrow funds from WGW, such borrowing to be secured by a priority security interest in and to all of the Debtor's prepetition and postpetition accounts and other personal property. WGW's interest will be subordinate to the security interest of Hilco under the Hilco Agency Agreement. The borrowing will be used solely to cover

the costs of liquidating the Debtor's business, including the administrative expenses of this case, until cash can be realized from the sale of the Debtor's assets.

25. The Debtor, given its recent financial history, cannot obtain necessary credit on an unsecured basis or by merely offering a lender an administrative claim. Credit is only available to the Debtor on a secured basis, and only from WGW, given its relationship to the Debtor.

26. The borrowing from WGW is in the best interests of the Debtor's creditors and its estate, as without such credit the Debtor could not cover the costs of an orderly liquidation in chapter 11. The Debtor does not have any other secured debt; thus, the Debtor's postpetition financing arrangement with WGW will not affect the rights of any other secured creditors.

*C. Cash Management Motion*

27. The Debtor seeks authority to continue its prepetition cash management system (the "Cash Management System") and to use prepetition bank accounts and business forms.

28. The Cash Management System consists of two checking accounts that facilitate the Debtor's timely and efficient collection, concentration, management, and disbursement of funds. The Debtor has one US Bank account that services all stores except the Debtor's La Plaza Mall location for credit card deposits, while the Debtor's La Plaza Mall location has a separate IBC Bank account for cash deposits only. All stores use the aforementioned US Bank account for cash deposits.

29. By authority of the Cash Management Motion, the Debtor seeks authority to continue the use of the Cash Management System from and after the Petition Date. Changing the Cash Management System would result in needless disruption of the Debtor's business and impede the Debtor's ability to seamlessly transition into chapter 11. Any new remittance

procedure may lead to confusion and delay in receiving payments, a result that would be particularly disastrous. Additionally, transitioning to a new cash management system would cause the Debtor to incur additional costs and deplete assets of the estate without providing any benefit to the Debtor's creditors.

30. The Debtor also requests that it be authorized to continue to use all correspondence, business forms and checks existing immediately before the Petition Date without reference to the Debtor's status in bankruptcy. The Debtor believes that it would be costly and disruptive to cease using all existing forms and to purchase and begin using new stationary, business forms, and checks.

*D. Schedules Motion*

31. The Debtor also seeks an order extending the time within which it must file its schedules and statements of financial affairs to sixty (60) days after the Petition Date. The Debtor maintains several stores within the United States and preparing the schedules and statements accurately and in detail will require considerable attention for the Debtor's personnel and advisors. The Debtor will have limited financial and administrative staff and that staff will be occupied by efforts to close the stores, conduct GOB Sales, and to otherwise deal with vendors, employees, and customers within the first several weeks post-petition. Accordingly, the Debtor anticipates that it will take significantly longer than the fifteen days provided in the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and this Court's local rules.

*E. Taxes Motion*

32. The Debtor's normal business operations result in the collection of State sales and use taxes remitted to the applicable taxing authorities. As of the Petition Date, the estimated

amount of the Debtor's accrued unpaid sales and use taxes is approximately $20,000.00. If these taxes are not paid, liens can attach to the property of the Debtor, thereby entitling the taxing authorities to postpetition interest or other adequate protection.

33. Furthermore, monetary penalties may be imposed for failure to make timely payment, and the Debtor's management could also be subject to collection efforts and litigation which would prove to be a substantial distraction from the management of the Debtor. Accordingly, the Debtor seeks authority to pay these accrued and outstanding prepetition taxes, and an order authorizing and directing applicable banks and financial institutions to process and pay all of the Debtor's deposits, wire transfers, and checks that may not have cleared prior to the Petition Date relating to the payment of such taxes.

34. Payment of these taxes will not prejudice any of the Debtor's unsecured creditors, and will ensure that the Debtor can avoid the potential penalties and liabilities associated with the nonpayment of such taxes.

*F. Insurance Motion*

35. The Debtor maintains six (6) insurance policies (the "Insurance Policies") that have been obtained through third party insurance carriers (the "Insurance Carriers"), which provide coverage for, *inter alia*, crime, property, general liability, primary umbrella, first excess liability, workers' compensation, and second excess liability. A list of the Insurance Policies and the Insurance Carriers and their corresponding premiums are listed on Exhibit A to the Insurance Motion. Continuation of the Insurance Policies is essential to the minimization of risk and preservation of the Debtor's estate. In many cases, the Insurance Policies are mandatory because of applicable laws, regulations and contracts that require the maintenance of coverage.

36. The Debtor pays its premiums on a lump sum basis. The Debtor is generally current on amounts owed to maintain the Insurance Policies. Certain amounts owed in connection with the Insurance Policies, however, are paid in arrears or have otherwise accrued before the Petition Date and have not yet been paid. As of the Petition Date, the Debtor estimates that a total of approximately $12,283.00 in prepetition amounts are outstanding under the Insurance Policies. Additionally, other payments may come due in the future that relate to Insurance Policy obligations incurred prepetition.

*G. Customer Programs Motion*

37. In the ordinary course of business, the Debtor provided its customers with certain benefits in the form of warranties, gift cards/certificates, promotional discount programs, returns, refunds, and adjustments.

38. Before the Petition Date, the Debtor sold, in the ordinary course of business, pre-paid gift cards and certificates to be used for purchasing goods from the Debtor's stores or through the Debtor's website (the "<u>Gift Card/Certificate Program</u>"). As of the Petition Date, there are approximately $1,066.25 of gift cards/certificates that have not been redeemed by the customers. Failure to honor these obligations may tarnish the Debtor's reputation or brand and affect the progress of the GOB Sales.

*I. Agency Agreement Motion*

39. As discussed above, prior to the bankruptcy filing, the Debtor, in consultation with its advisors, determined that the value of its assets was quickly declining. The Debtor undertook an extensive marketing process to solicit bids for the Debtor's assets. As a result of these efforts, the Debtor determined that Hilco's proposal would yield the highest return to

creditors, and therefore, the Debtor entered into the Hilco Agency Agreement. The Hilco Agency Agreement provides, in relevant part, that Hilco will conduct GOB Sales at the Debtor's stores and will guarantee that, after expenses, the Debtor will recover at least thirty-five percent (35%) of the aggregate cost of value of the Debtor's merchandise. Pursuant to the Hilco Agency Agreement, Hilco will take over operations, pricing, and management of the stores during the GOB Sales with minimal involvement from the Debtor thereby reducing further costs to the estate.

40. In order for Hilco to conduct the GOB Sales as quickly and efficiently as possible, and minimize unnecessary administrative expenses, it is essential that the Debtor be permitted to continue to perform pursuant to the Hilco Agency Agreement without delay.. Without receipt of immediate payment of the guaranteed amount from Hilco, the Debtor will lack the financial wherewithal to satisfy its obligations and provide creditors with the best return possible on their claims. Moreover, in order to maximize the value of the Debtor's assets, Hilco will require immediate authority to perform under the Hilco Agency Agreement.

### III. The Second Day Motions

*A. BSSN Application*

41. The Debtor requires bankruptcy counsel with substantial experience in bankruptcy and related matters. The Debtor has selected Bernstein, Shur, Sawyer & Nelson, P.A. ("BSSN") to serve as its general bankruptcy counsel because of BSSN's recognized expertise in the field of business reorganizations under chapter 11 of the Bankruptcy Code, as well as all areas of the law that typically arise in the context of a case under chapter 11. In particular, BSSN has substantial experience in complex cases involving the representation of

debtors and debtors in possession under the Bankruptcy Code. Accordingly, BSSN (i) has the necessary background to deal effectively with many of the legal issues and problems that may arise in the context of the Debtor's chapter 11 case and (ii) is well qualified to represent the Debtor in its chapter 11 case in an efficient and timely manner. The professional services of BSSN are necessary to enable the Debtor to execute faithfully and competently its duties as a debtor in possession. Subject to the control and further order of the Bankruptcy Court, the Debtor proposes to retain BSSN to perform the services detailed in the BSSN Application

### B. S&L Application

42. The Debtor requires local bankruptcy counsel with substantial experience in Delaware bankruptcy and related matters. The Debtor selected S&L primarily because of S&L's substantial experience in Delaware bankruptcy cases, as well as most aspects of the law that have arisen in chapter 11 cases. S&L has extensive experience with the local bankruptcy bar and rules of this Court and has become intimately familiar with the Debtor's business affairs and capital structure, and will be able to immediately assist the Debtor and BSSN in their efforts in this case. The professional services of S&L are necessary to enable the Debtor to execute faithfully and competently its duties as a debtor in possession. Subject to the control and further order of the Bankruptcy Court, the Debtor proposes to retain S&L to perform the services detailed in the S&L Application.

### C. Utilities Motion

43. In the ordinary course of the Debtor's business, the Debtor uses electricity, internet, telephone, and water utilities among others. These utilities are essential to the Debtor's ongoing business operations; indeed, the Debtor relies on these services to market and sell

various denim products, take orders and address customer concerns, and generally operate its business. Without any one of these utility services, the Debtor's operations would be severely impeded. Accordingly, the relief requested in this Motion is in the best interests of the estate and its creditors.

44. By the Utilities Motion, the Debtor seeks immediate entry of an order: (a) prohibiting the utility companies (the "Utility Companies") from altering, refusing or discontinuing service on account of prepetition invoices; (b) limiting the amount of adequate assurance to a deposit which does not exceed a normal monthly bill, as set forth on Exhibit A to the Utilities Motion; (c) providing that if a Utility Company timely requests adequate assurance that the Debtor believes is unreasonable, the Debtor will file a motion for determination of adequate assurance of payment and serve such motion for hearing at the Court's discretion (a "Determination Hearing"); and (d) in the event a Determination Hearing is scheduled, the Utility Company requesting adequate assurance shall be deemed to have adequate assurance of payment until an order of the Court is entered in connection with such Determination Hearing.

I certify under penalty of perjury that the foregoing is true and correct.

Dated: July 21, 2014

_____
Scott Merrell

15